FILED
2021 Mar-01  PM 02:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **JOSHUA HOUSLEY and TRANSPORTATION INSURANCE COMPANY, as subrogee of Dixie Pulp & Paper, Inc.,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **CIVIL ACTION NO.:** |
| | ) | **7:20-cv-00010-LSC** |
| **v.** | ) ) | |
| **LIFTONE, LLC.,** | ) ) | |
| **Defendant.** | ) | |

## DEFENDANT LIFTONE, LLC.'S BRIEF IN SUPPORT OF OPPOSED MOTION TO EXCLUDE EXPERT TESTIMONY AND EXPERT REPORTS OF PLAINTIFFS' EXPERTS, HEATH SMITH AND PERRY A. HOPKINS

COMES NOW the Defendant, LiftOne, LLC., ("LiftOne") and submits the following brief in support of its Motion to Exclude the Testimony and Expert Report of Plaintiffs' Proposed Expert Witnesses, Heath Smith and Perry A. Hopkins, and shows unto this court as follows

## I.     Background Information

This case arises out of a fire that occurred on August 6, 2018 at the premises of Dixie Pulp & Paper, Inc. ("Dixie"), subrogee of Transportation Insurance Company ("TIC"). The fire began in or near the engine compartment of a 2014 Hyster lift truck (also known as a "forklift" or "claw truck") leased to Dixie. As a result of the fire and/or the efforts to extinguish it, the propane tank which  fueled

the lift truck exploded, causing minor personal injuries to Plaintiff, Joshua Housley, and damaging Dixie's property. A video camera captured the fire and explosion. However, approximately the twelve minutes of the video, including the initiation of the fire, are missing.

On January 3, 2020, Housley and TIC ("collectively "Plaintiffs") filed suit against LiftOne alleging breach of contract and negligence. In their complaint, Plaintiffs specifically alleged that:

> **9.     The subject lift truck came equipped with a paper mill package, which included installation of thermal wrap on certain areas of the lift truck's engine, including the lift truck's headers, to protect against a potential fire hazard created by paper dust and debris accumulating around the hot engine.**

> **14.     Investigation revealed that the fire was caused by combustible materials and/or paper debris coming into contact with the lift truck's headers, due to the thermal wrapping having been removed.**

> **15.     LiftOne removed the thermal wrap from the lift truck's headers while performing maintenance and improperly failed to re-install it, causing the lift truck to catch on fire.**

> **21.     Defendant LiftOne breached its duty to Housley and Dixie Pulp & Paper by:**

>> **A. Failing to properly re-install the thermal wrap after removing it and completing work on the lift truck's engine.**

**B. Failing to properly inspect the lift truck, upon completion of maintenance to ensure that the thermal wrapping was re-installed**

24.    **Defendant LiftOne breached its duty to Housley and Dixie Pulp & Paper by:**

**A. Failing to properly re-install the thermal wrap after removing it and completing work on the lift truck's engine;**

**C. Failing to properly inspect the lift truck, upon completion of maintenance to ensure that the thermal wrapping was re-installed. (emphasis added).**

Therefore, the entire gravamen of Plaintiff's claims against LiftOne is that it removed the subject thermal wrap (also described in depositions as a heat shield) from the lift truck's manifold, failed to reinstall it and that these actions (or inactions) caused the fire and resulting injuries and/or damages. [1]

## II.    THE LEGAL STANDARD FOR ADMISSIBLE EXPERT TESTIMONY UNDER FED. R. EVID. 702 AND DAUBERT.

Federal Rules of Evidence 702 provides that a witness "who is qualified as expert by knowledge, skill, experience, training, or education" may offer opinion testimony if (1) the expert's specialized knowledge "will help the trier of fact to understand the evidence," (2) "the testimony is based on sufficient facts or date;" (3)

---

[1] In accordance with the Court's original scheduling order, the deadline for Plaintiffs to have amended their pleadings expired on July 16, 2020. Although Plaintiff has recently alleged in the Parties' Joint Report that, if an electrical fault caused the fire then LiftOne is liable, this is not what has been alleged in Plaintiff's complaint.

"the testimony is the produce of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the  case."

*Fed. R. Evid. 702*. "[T]he task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" is assigned to the district court. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

The Supreme Court has identified four factors that district courts should consider when assessing the reliability of an expert's testimony: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community. *See, Daubert* at 593-94. At the same time, the Court has emphasized that these factors are not exhaustive and are intended to be applied in a "flexible" manner. *Kumbo Tire co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

The Eleventh Circuit Court of Appeals has established that a District Court must engage in a "rigorous three party inquiry" to determine the admissibility of expert testimony of Rule 702. Trial courts must consider whether

> (1)   the expert is qualified to testify competently regarding the matters he intends to address; (2) the

> methodology by which the expert reaches his conclusions
> is sufficiently reliable as determined by the sort of inquiry
> mandated in <u>Daubert</u>, and (3) the testimony assists the trier
> of fact, through the application of scientific, technical, or
> specialized expertise, to understand the evidence or to
> determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros*

*Chems., Inc.,* 158 F.3d 548, 562 (11th Cir. 1990)), accord, *Haney v. Eaton Electrical,*

*Inc.,* 528 F. Supp. 1262, 1266 (N.D. Ala. 2007)).

Once a court has deemed a particular expert to be qualified, the inquiry turns

to the process used by the witness in forming his expert opinion, which must be

sufficiently reliable under *Daubert* and its progeny. *See Quiet Tech DC-8, Inc. v.*

*Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1342 (11th Cir. 2003). "[I]f the witness is

relying solely or primarily on experience, then the witness must explain how that

experience leads to the conclusion reached, why that experience is a sufficient basis

for the opinion, and how that experience is reliably applied to the facts. The trial

court's gatekeeping function requires more than simply "taking the expert's word

for it." *Frazier* supra at 1261 (quoting *Fed. R. Evid. 702* advisory committee note

(2000))(internal quotations omitted)).

In *Haney,* supra, this Court stated:

> The primary focus of a *Daubert* inquiry is the principles
> and methodology underlying expert opinion testimony,
> not on the conclusions they generate. *Id.* (citing *Daubert,*
> *509 U.S. at 595, 113 S.Ct. 2786).* However, testimony
> based solely on the experience of the expert is not

admissible. *Rider v. Sandoz Pharm. Corp.,* 295 F.3d 1194, 1197 (11th Cir.2002) (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 157, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). The trial court must be sure the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* Accordingly, the proponent of the testimony does not have the burden of proving that the testimony is scientifically correct, but that by a preponderance of the evidence, it is reliable. *Allison,* 184 F.3d at 1312; *see also Joiner,* 522 U.S. at 146, 118 S.Ct. 512 ("[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Daubert,* 509 U.S. at 589–90, 113 S.Ct. 2786 (Rule 703 requires that the subject of an expert's testimony must be "scientific knowledge" and "knowledge" connotes more than a subjective belief or unsupported speculation; any inference or assertion must be derived by the scientific method to qualify as "scientific knowledge."). This scientifically valid connection between the opinion and the facts has also been called "analytical fit." *Rider,* 295 F.3d at 1197.

*Daubert* also requires a special inquiry into relevance, calling on the trial court to ensure that expert testimony logically advances a material aspect of the proposing party's case. *Allison,* 184 F.3d at 1312 (citing *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786). There must be a valid scientific connection between the testimony and the disputed facts in the case. *Id.*

As this Court also stated in *Day, LLC. v. Plantation Pipe Company,* 315 F. Supp 3rd 1219, 1227-1228 (N.D. Ala. 2018).

"Merely demonstrating that an expert has experience, however, does not automatically render every opinion and statement by that expert reliable." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1201 (11th Cir. 2010). The Advisory Committee Notes to Rule 702 state:

If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it." ... The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable.

Committee Notes on Rules—2000 Amendment (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ).

Finally, a court may exclude expert testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. *Frazier at 1263; see also Fed. R. Evid. 403.* Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a court "must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id.*

## III.   Mr. Smith's Opinions

On October 20, 2020 Plaintiffs identified two experts, Heath Smith and Perry Hopkins, and stated regarding Mr. Smith that:

Health Smith, IAAI-CFI(V), fire investigator, EFI Global. Mr. Smith conducted an investigation into the origin and cause of the fire at issue and is expected to provide expert testimony in accordance with his report being provided contemporaneously with this disclosure. Mr. Smith's

qualifications, trial and deposition testimony for the previous four years, and fee schedule are being provided with his report.

Expert disclosures previously marked as Exhibit 3 to Mr. Smith's deposition, and filed herewith as Exhibit D-1, along with LiftOne's evidentiary submission.

Plaintiffs also provided LiftOne with Mr. Smith's report, previously marked as Exhibit 4 to Mr. Smith's deposition and file herewith as Exhibit D-2, along with LiftOne's evidentiary submission.

In pertinent part, that report states:

Summary of Conclusions

- The fire originated inside the engine compartment of a 2014 Hyster Fortis 120 lift truck operating inside the commercial structure.
- The first fuel ignited was paper debris/dust.
- The ignition source was the engine manifold on the right side of the machine's engine compartment.
- **The ignition sequence was determined to be the heat sink of the engine exhaust components upon parking the lift truck reaching sufficient temperature to ignite the thermally thin paper debris/dust accumulated on the engine manifold. (emphasis added)**

Fire Cause Analysis

> The analysis of a fire to determine cause involves consideration of the factors necessary for the fire to occur. These factors include an examination of potential ignition sources, potential fuels, and the circumstances that allowed those factors to come together and start the fire.

The following potential sources of ignition were identified and analyzed:

1. Open flame propagation from an intake system backfire was evaluated and eliminated as a possible ignition scenario due to the involved lift truck not being operating at the inception of the fire.

2. Electrical sources were examined and an arc severed conductor providing power to the starter was discovery (Photos 66-69) and remained a possibility until further examination was conducted by Mr. Perry Hopkins an Electrical Engineer who opined that the arc was the result of fire attack as opposed to causation.

3. Hot surface ignition of thermally thin paper in the form of dust particulates resulting from direct contact with the un-protected engine manifold was examined and could not be eliminated to any degree of scientific certainty as the causation of this fire event. A lift truck operating inside a paper mill in which dust production is common, often constitutes the installation of heat protection devices in the form of shielding to prevent thermally thin combustibles from contacting the hot surfaces of the engine and exhaust system. The lift truck involved in this fire had heat protection installed on the exhaust however the heat protection was not present on the manifold of the engine (Photo 71-72) allowing thermally thin paper particulates to rest directly on the hot surface of the manifold. Exemplar units examined in the same setting had the required heat protection installed (**Photos 120 & 121**). **A motorized vehicle will experience a phenomenon referred to as "heat soak"**

9

**upon stopping and turning the engine off. Heat soak is the occurrence of increased temperatures inside the engine compartment including an increase in surface temperatures. This occurs as a result of air movement across the engine surfaces stops once the movement of the vehicle stops. Additionally, the cooling fans that provide air movement during operation also cease to operate upon shutdown. The temperatures inside the engine compartment increase gradually for a period of time prior to beginning to decrease. During this time of increased temperatures hot surface ignition of thermally thin combustibles is of greater probability. (emphasis added)**

**[Exhibit D-2, P. 5-6]**

On November 25, 2020 counsel for LiftOne deposed Mr. Smith. His deposition is filed herewith as Exhibit D, along with LiftOne's evidentiary submission and pertinent portions are referenced herein.

The problem with Mr. Smith's proffered testimony is that, although he purports to employ the "scientific method" in arriving at his opinions, in actuality there was nothing "scientific" and very little "method" employed. As can be seen by his report, his theory hinges on his belief that a "heat sink" ("or heat soak") was created in the engine compartment of the parked lift truck, causing a rise in temperature sufficient to ignite debris and dust accumulated on the engine manifold.

When asked to describe his methodology Mr. Smith stated:

Q.      Okay. If you don't mind, take me through the
        steps that somebody goes through -- and I'm just
        talking about in general as a fire investigator
        -- to – or origin and cause investigator to
        determine, you know, what has caused a fire.
        What's the  analysis you do?

A.      So, we use what's referred to as the scientific
        method in which you recognize the need. So,
        obviously, there was a fire. You define the
        problem, what the fire was. You collect data.
        And then, you analyze that data. And **you
        develop hypotheses, and then, you test said
        hypotheses. And then, you select a final
        hypothesis from your testing.**

Q.      Okay. So, what you stated in here under
        analysis, is that what you would consider to be a
        hypothesis?

A.      Well, you -- just like in a – in a scientific
        experiment, you develop multiple hypotheses, and
        then, you work to disprove those hypotheses. When
        you get to the point that you have one that cannot be
        disproven, then, that is your final conclusion.

Q.      Okay. So, you start with a working     hypothesis, I
        guess. You might have several  as  to  what caused
        the fire --

A.      Sure.

Q.      correct? **All right. Did you start with several
        hypotheses as to what could have  caused this
        fire?**

A.      **After reviewing John Neil's documents, there
        was two hypotheses that remained, that required**

11

> **further analysis, and thus, why we brought the electrical engineer in, to analyze one of those.** [2]

Q.    **Okay. What were those two hypotheses?**

A.    **So, the first was the possibility of paper dust being ignited by the hot surface of the manifold.**

Q.    Okay.

A.    **The second hypothesis was an electrical arc was identified on a conductor going to the starter of this machine. And the electrical engineer was brought in to determine or to opine as to whether or not that electrical arc was causation versus fire attack. (emphasis added)**

**[Smith depo. P. 154, 15 – P. 157, L4].**

Mr. Smith is not an engineer. Consequently, in order to try and eliminate the second hypotheses (that an arc caused the fire), he relied on conclusions of an engineer, Perry A. Hopkins.

## IV.    Mr. Hopkins' Opinions

Regarding Mr. Hopkins, Plaintiffs' expert disclosures stated:

**Perry a. Hopkins, P.E., Engineering Systems, Inc. Mr. Hopkins conducted an engineering investigation into the fire at issue and is expected to provide expert testimony in accordance with his report being provided contemporaneously with this disclosure. Mr. Hopkins' qualifications, trial and deposition testimony for the previous four years, and fee schedule are being provided with his report. (emphasis added)**

---

[2] John Neil is the previous fire investigator hired by TIC.

**[Exhibit D-1 P. 2].**

In turn, Mr. Hopkins' report stated:

<u>Analysis</u>

**The main electrical positive battery cable was routed from the positive terminal of the battery along the right side of the engine area and terminated at the starter solenoid located at the lower rear portion of the engine. An electrical arcing event was present between the positive battery cable and the b rack that supported the cable at the rear portion of the engine.**

**Based on the inspection of the exemplar lift, the positive battery cable consisted of a single stranded conductor that was contained within an outer wire loom tubing along the entire length of the cable. The positive battery cable was secured to the bracket by means of electrical tape where the electrical activity was observed on the subject unit.**

**A search of the National Highway Traffic Safety Administration (NHTSA) website was conducted for any recalls or technical service bulletins (TSB) for a Hyster lift of this make and model. There were no recalls or TSBs for this make and model and in particular, no issues with the securing of the positive battery cable to the bracket or any other electrical issues.**

**The fire initially attacked the lift's positive batter cable by first melting the outer wire loom of the battery cabled. As the fire attack continued, the battery cable's insulation began to melt and char. Eventually, the battery cable's insulation was compromised and a conductive path between the battery cable and the ground bracket caused the electrical arcing event. Therefore, the electrical arcing event was a result of the fire and not the cause of the fire.**

**Conclusions**

**The following conclusions have been made to a reasonable degree of engineering certainty and are based on the information provided, the visual examination, and engineering analysis performed to date. ESI reserves the right to amend these conclusions if new information is learned or made available.**

**As a result of my electrical investigation, the following was determined:**

- **The loss is not the result of an electrical arcing event and is not electrical in nature. (emphasis added)**

**[Exhibit E-1 P. 1-2].**

On December 3, 2020 Liftone's counsel deposed Mr. Hopkins. Unlike Mr. Smith, Mr. Hopkins does not claim to be a fire origin and cause expert, [Hopkins P. 37, L8-23] and expresses no opinion on the cause or origin of the subject fire. [Hopkins P. 38, L1-22]. In this case he was only asked by Smith to look at the electrical system of the lift truck. [Hopkins P. 32, L4-011]. He inspected the subject lift truck and an exemplar lift truck. His inspection of the subject lift truck revealed evidence of arcing on the battery cable where it was attached to a bracket near the starter. [Hopkins P. 54, L12 – P. 73, L4]. However, he could not determine what caused the arc to occur. [Hopkins P. 74, L17]. For this reason he wanted to examine an exemplar lift truck to see if that would help him determine what caused the fire [Hopkins P. 74, L8-19; P. 45, L13-23, P. 46, L1-4]. [Hopkins P. 83, L10-17]. These

two inspections were the most significant things as far as formulating his opinions. [Hopkins P. 45, L13-23; P. 46, L1-4]. However, even after inspecting the exemplar, he still could not make a determination as to the cause. [Hopkins P. 83, L10-17]. To attempt to reach a conclusion, he reviewed the service history of the subject lift truck and Hyster documents regarding recalls. [Hopkins P. 78, L16 – P. 80, L21; P. 81, L23 – P. 82, L22]. Those documents simply showed no recalls of similar battery cables and no service work performed on the subject battery cable. *Id.* From this, Mr. Hopkins somehow concluded the arc did not cause the fire, but that the arc occurred when fire attacked the battery cable. In essence, Mr. Hopkins' conclusion is that the battery cable did not cause this arc because,  as far as he knows, no such arcs have occurred before. However, both Alabama State Courts and Federal Courts have long recognized that evidence of the occurrence or non-occurrence of accidents to others at other times is only even admissible if the condition of the place or thing at such other times was substantially the same as the condition existing at the time of the accident in the subject suit. *McDonald's Corp. v. Grisson*, 402 So.2d 953, 955 (Ala. 1982); *see also Pittman v. Littlefield*, 438 F.2d 659, 662 (1st cir. 1971). c*iting.*

> *Howe v. Jameson*, 91 N.H. 55, 13 A.,2d 471 (1940) (by implication); *Canney v. Rochester Agricultural & Mechanical Association,* 76 N.H. 60, 79 A. 517 (1911); accord, C*hesapeake & O. Ry. v. Newman,* 243 F.2d 804, 813 (6th Cir. 1957); *Wray v. Fairfield Amusement Co.,* 126 Conn. 221, 225-226, 10 A.2d 600, 603 (1940). See generally Annot., 31 A.L.R.2d 190, 220-226 (1953).

Here, there has been no showing of substantial similarity, so the non-occurrence of similar arcs should not be considered and, therefore, should not be relied upon by Mr. Hopkins in formulating his opinions.

In addition, Mr. Hopkins cannot eliminate the possibility that the battery cable had an inherent defect that existed from the time it left Hyster's factory. He stated:

> Q.   Okay. So, what additional information did you need to determine that, in your opinion, this short was caused by the attack of fire rather than a short that caused the fire?
>
> A.   What was the service history on the -- on the unit –
>
> Q.   Okay.
>
> A.    -- as well as were there any other recalls issued by Hyster on these particular units that would indicate they have an issue with the routing of that cable.
>
> Q.   Okay. What about the service history caused you to formulate your opinion that this wire was attacked by the fire?
>
> A.   That there wasn't a replacement of the cable as a result of the first fire.
>
> Q.   Okay. Does that presuppose that there was no defect in that cable when that piece of equipment came from the factory?
>
> A.   Correct.
>
> Q.   Is there any way to determine whether there was any defect in that cable when the piece of equipment came  from Hyster's factory?

A.    Given that it had been used for as long as it had and
      the history of it, I would say that there was no defect
      in it.

Q.    Okay. So, really just the fact that they had not had a
      fire before indicates to you that the fire was not
      caused by some defect in the cable, correct?

A.    In the time frame, yes, sir.

Q.    Can you -- is there any way to absolutely rule out
      the possibility of a defect in the cable?

A.    No. That was considered as a possibility.

Q.    But do you consider that to be probable?

A.    It was a possibility.

Q.    Okay. Is it a possibility that even today, you could
      rule out?

A.    It's a possibility.

**[Hopkins P. 80, L2 – P. 81, L22]**

This is not the kind of analysis *Daubert* contemplates. Mr. Hopkins' conclusions are

exactly the type of *ipse dixit* opinions this Court rejected in *Haney supra.*, because

they are completely devoid of intellectual rigor. Not only is there an analytical gap

in his data, there is no data, certainly no data creating a scientifically valid

connection between the facts he observed and his opinions. Therefore, there is no

"analytical fit" and Mr. Hopkins' opinions fall into the category of subjective belief

and unsupported speculation based on shaky inferences.

While a properly qualified expert witness may rely on the opinions of experts in a particular field, the opinions relied upon must also be reliable and one expert may not blindly repeat or adopt the findings of another expert without investigating them. Such blind reliance demonstrates flawed methodology under *Daubert*. *See Hendrix v. Evenflo Company, Inc.,* 255 F.R.D. 568 (N.D. Fla. 2009). (citing footnote 75.). *See also Rudd v. General Motors Corporation,* 127 F.Supp. 2d 1330 (M.D. Ala. 2001), (citing footnote 5 Fed.R.Evid. 702 advisory committee notes, 2000 amendment).

As shown, the opinion of Mr. Hopkins is not reliable but is mere supposition, based upon the absence of similar arcs. Since Mr. Hopkins' opinions in this case are not reliable, Mr. Smith cannot rely upon them in excluding the battery cable as the possible cause of this fire.[3] This is especially true where he has disregarded the opinion of the Tuscaloosa Fire Department that the fire's cause was "undetermined," [Smith P. 127, L7 – P. 128, L10] and Dixie's belief that a previous fire in the same lift truck had been caused by the presence of heat shields, not from their absence. [Smith P. 135, L8 – P. 137, L14]. In addition, he relied on the video, even though he admits the missing twelve minutes would be helpful. [Smith P. 172, L19 – P. 175, L17]. Neither he nor Mr. Hopkins should be allowed to selectively disregard such facts while wholly relying on others.

---

[3] Assuming, for the sake of argument that Mr. Smith is even qualified.

Similarly, Mr. Smith cannot rely on his own methodology to determine that the fire was caused by a heat sink (or soak) causing a temperature rise that allegedly caused paper and dust to ignite, because he lacks sufficient knowledge and failed to employ his own methodology, which requires testing, to enable him to make that determination.

First, Mr. Smith does not know and cannot determine the amount of dust that was in the engine compartment at the time of the fire. [Smith P. 172, L19 – P. 173, L6], and does not know the temperature inside the engine compartment on the day in question. [Smith P. 198, L23 – P. 199, L6]. Furthermore, he does not know the ignition temperature of such dust and debris [Smith P. 139, L1-L19][4], or whether the buildup of dust and debris on a heat shield can cause a fire. [Smith P.137, L15 – P. 138, L3], Mr. Smith made no effort to do any testing to replicate his theory that the ignition of dust and debris caused the fire. He testified:

> Q.    Okay. Were you able to determine whether, in fact, dust buildup on a heat shield can cause a fire?
>
> A.     I haven't done any testing to that effect, no.
>
> Q.    Yeah. Have you done any testing at all in this case?
>
> A.    Me personally, as far as me physically doing testing, no. I've relied on other sources of testing that have been completed in scientific experiments and that sort of thing. But me physically, no.

---

[4] Although Mr. smith makes vague references to written material supporting his opinions, he could not quote it specifically and it is not contained in his report or provided with his file material.

Q.   Okay. Tell me about that testing. What kind of testing are you talking about?

A.   Well, there's -- there's – for example, there's a book entitled The Ignition Handbook that Vincent Babrauskas, I believe is how you pronounce the last name, has gone through. And, I guess, this guy, basically, was a -- he just liked burning stuff to see what temperatures things burn at. And he's documented in that book ignition temperatures and that sort of thing of various products and that sort of thing.

Q.   Okay. Did he do an analysis of the ignition temperatures of paper dust and debris?

A.   There are -- there are some paper products. But as far as physical, actual dust, there isn't any direct reference to that, no.

Q.    Okay. So, as you sit here today, do you know what the ignition temperature would be for dust or paper dust or debris in a forklift?

A.    I can't put an exact quantifiable number on it, no. But I can say that, obviously, dust and any particulate matter being thermally thin is more susceptible to ignition than solid materials.

Q.   And would I be right that the -- whatever the ignition temperature is would be the same whether that dust and debris is on the manifold, collected on the manifold of the lift truck, or collected on the heat   shield of the lift truck if it's -- in other words, if it's going to catch fire, it's going to take the same temperature to make it catch fire; is that a fair statement?

A.   Yes. That's correct.

**[Smith P. 137, L15 – P. 140, L2].**

Q.   And you have not done any testing to see whether you could replicate the cause of this fire, correct?

A.    No, I haven't.

Q.    You haven't taken, for instance, a forklift and run it for an hour and a half or whatever this forklift was run prior to this fire to see whether the paper dust and debris would combust, have you?

A.    I haven't, no. But, I mean, again, it's a -- it's a thermally thin item in direct contact with a hot surface that is known to cause sufficient enough temperatures to ignite thermally thin items.

Q.    All right. And you haven't done any testing to see whether this fire could have been caused by a propane leak, correct?

A.    I haven't, other than the review of the documentation that was done by John Neil in photographing the components of the fuel system.

[Smith P. 168, L23 – P. 169, L20].

Q.    So, do you have any idea if you've been able to determine -- and you've already expressed your opinion that this fire was caused by a combustion of paper dust and debris. Have you made any determination as to how much paper dust and debris was on -- was in this engine compartment at the time of the fire?

A.    No. There's no way to quantify that because of the consumption of that material.

Q.    Yeah. And would you agree with me that it would have to have been a significant amount of dust and debris to have, after it ignited, propagated into a fire big enough to get to that propane tank to cause it to explode?

MR. SMITH: Objection to form.

Q.    (BY MR. ASH) Do you agree with that?

A.    Define significant.

Q.    Well, it's got to be enough that either the dust and
debris produces enough fire and enough heat
to get to that propane tank or it produces
enough fire to cause things like the seat of the
forklift – the other component parts to catch fire to
then propagate that fire and that heat to the
propane tank; would you agree with that?

A.    Well, you've got -- you've got a bunch of other fuel
packages inside that engine compartment in the
form of        plastics, in the form of rubbers, and
things of that nature that once a -- all it takes is
a small fire to begin to cause the consumption of
those other  materials that, then, the fire grows.
And, ultimately, yes, it gets to the propane tank
and results in the BLEVE that we witnessed on
the video.

Q.    Well, don't you think -- so, again, you're talking
about -- you need to know how long the fire
burned in order to make    a    determination,    a
conclusive determination, in your opinion, as to
what caused the fire?  wouldn't you need that?

A.    No. I don't -- I don't think you necessarily have to
know how long.

Q.    Well, it would help.

A.    You know, you have to -- well, sure, any additional
data would help.

Q.    Okay.

A.    But --

Q.    We talked about –

A.     -- you don't have to know the length of time that a fire burns in order to determine the origin and cause.

Q.    Okay. Well, we talked about the video a little while ago having a twelve- minute gap. That twelve-minute gap  occurs just as this fire is beginning, doesn't it?

A.    The video that I've seen shows the fire once it has penetrated the seat pan and is coming from the engine compartment up the lift truck, yes.

Q.    We don't know how long that fire had been burning at the time we first see the fire on this video; is that right?

A.    Do not, no.

**[Smith P. 172, L19 – P. 175, L17].**

Q.    When you're talking about heat sink and in the subject lift truck, have you made any determination as to how high the temperature rose as a result of heat sink in the subject lift truck on the day of the fire?

A.    No.

Q.    Is there any way to determine that?

A.    Not on the exact lift truck, no. I mean, you could take an exemplar truck and put some thermocouples on it and do some testing. But even -- still, even though it's the same exact  model engine, same exact everything, there are

variations that could cause that temperature to vary from truck to truck. So, there's no way to know on our loss vehicle what that temperature actually increased to.

Q.     Well, if you don't know what the increased temperature went to, how do you know that it got so high that it ignited this paper dust and debris?

A.     Well, because just off of standard operating temperatures alone are significant enough to cause that type of ignition. And so, when you stop the truck and it goes through heat sink, even     with it stopped, you've got the capability of that paper dust being ignited. But, then, you add to it the increased temperature as a result of heat sink, and it only makes that possibility that much greater.

Q.     Is there anywhere I can find literature that talks about heat sink?

A.     I'm sure there is.

Q.     Did you site any of it in your report?

A.     I did not, no.

Q.     Let me ask this: You said – if I understand what you testified to a minute ago, you said there would have been enough heat -- you don't know exactly what the temperature would have been, but there   would have been enough heat generated the day of this fire in this heat sink phenomenon to have combusted this undetermined amount of paper and paper dust, correct?

A.     That's correct.

[Smith P. 199, L23 – P. 201, L2].

24

Therefore, Mr. Smith has not followed his own protocol, requiring testing, and has no scientific basis for his conclusion. Like those of Mr. Hopkins, Mr. Smith's opinions are subjective, unsupported, speculative "*ipse dixit*," based on nothing but shaky inferences. Essentially, he is asking this Court to "take him at his word" based on his experience alone. However, this too is problematic, since his experience and qualifications to render his opinions are virtually non-existent.

According to his resume, Mr. Smith worked from 2005 to 2018 as a firefighter/EMT, Assistant Fire Marshall, and eventually Fire Chief with the municipalities of Anniston, Lincoln, Gadsden and Argo, Alabama, respectively. [Smith P. 30, L13 – P. 38, L3]. Mr. Smith holds an undergraduate degree and Master's degree from Columbia Southern University, in "Fire Administration" and Business Administration, with a concentration in Public Administration, (both of which indirectly dealt with firefighting) and both of which he completed "on line" in three and a half years, while working as a firefighter in Gadsden, Alabama. [Smith P. 40, L11 – P. 42, L8]. His first involvement with fire investigation was while working in Gadsden from 2017-2018. In 2018 he began working for EFI Global as a Fire Investigator. He has previously given depositions in only two cases neither involving a lift truck, and has never given in court testimony. He has previously inspected only one other lift truck during the course of investigating a fire. In that case, a warehouse fire, the lift truck was almost completely consumed and no cause

of the fire was ever determined. [Smith P. 13, L1 – P. 15, L12]. Therefore, he has no experience that qualifies him to opine as to what caused the fire in the subject lift truck and he has done no testing to seek to determine the cause.

The Eleventh Circuit Court of Appeals decision in *United Fire and Casualty Company v. Whirlpool* 704 F3d 1338 (11th Cir. 2013), is instructive here. That case, as with the present one, was brought by an insurance subrogee but involved a fire in a clothes dryer rather than a lift truck. There, as here, Plaintiff proffered the testimony of two experts. Unlike here, however, both experts were engineers. The first expert, Mr. Arms, sought to determine both the cause and origin of the fire. The District Court excluded his testimony as to both. Although the Court of Appeals reversed the District Court's decision excluding his testimony regarding the origin, it affirmed The District Court's decision as to the cause, noting Mr. Arms reached this conclusion (that a fault in a wire sticking to an exhaust tube was the cause) without testing any exemplars to determine the plausibility of his theory. *Id.* at 1340. Here, Smith is in the same position as Mr. Arms, having done no testing to determine the cause of the subject fire[5] and for the same reason his testimony and report should be disallowed.

As here, the second expert in *United Fire and Casualty,* supra., Mr. Clarke, was not proffered as a cause and origin expert, but was retained simply to determine

---

[5] The origin, in or about the engine compartment, is not in dispute

the temperature the metal exhaust tube reached during the fire. In finding that the District Court had improperly excluded his testimony, the Court of Appeals noted that Mr. Clarke had used his advanced degree and advanced training in metallurgy and had used several metallurgy tools, including an electron microscope, to analyze the microstructural properties of the metal tube and that his specialized knowledge, including familiarity with the temperatures at which different metals melt and the microstructural properties of metal that has been exposed to high temperatures. *Id* at 1342-1343. Unlike Mr. Clarke, Mr. Hopkins has conducted no microscopic or other scientific examination of the subject battery cable to determine if its properties are consistent with having arced and caused the fire or having arced as a result of it. In fact, he admits that his cursory examination of the battery cable did not allow him to make such a determination. For these reasons, both Hopkins and Smith's opinions should be excluded

In short, Mr. Smith and Mr. Hopkins have totally failed to meet the requirements of *Daubert* and its progeny. Allowing them to testify or their reports to be admitted, would result in exactly the unfair, misleading, and confusing testimony that *Daubert* seeks to prevent. Moreover, the prejudicial effect of such evidence would far outweigh it probative value. For the aforesaid reasons, the testimony and reports of Mr. Smith and Mr. Hopkins should be excluded.

## **CONCLUSION**

Based upon the foregoing, LiftOne moves this Honorable Court to exclude the testimony and reports of Plaintiff's experts, Heath Smith and Perry A. Hopkins.

Respectfully submitted,

***s/C. Jeffery Ash***
C. Jeffery Ash
(ASB-9502-A58C; ASH004)
Attorney for Defendant
Porterfield, Harper, Mills, Motlow &
Ireland, P.A.
22 Inverness Center Parkway,
Suite 600
Telephone: (205) 980-5000
Email: cja@phm-law.com

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

**JOSHUA HOUSLEY and TRANSPORTATION**   )
**INSURANCE COMPANY, as subrogee of Dixie**   )
**Pulp & Paper, Inc.,**   )
   )
      **Plaintiffs,**   )   **CIVIL ACTION NO.:**
   )   **720-CV-00010-LSC**
**v.**   )
   )
**LIFTONE, LLC.,**   )
   )
      **Defendant.**   )

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 1st day of March 2021, I electronically filed the foregoing using AlaFile system, which will send electronic notification of such filing to:

**Justin L. Smith**
*Attorney for Joshua Housley*
Cross & Smith, LLC
907 17th Avenue
Tuscaloosa, AL 35401
justin@crossandsmith.com

**John W. Scott**
Kara Deal Gamble
*Attorneys for Transportation Ins. Co.*
Scott Dukes & Geisler, PC
211   Twenty Second Street North
Birmingham, AL 35203
jscott@scottdukeslaw.com
kgamble@scottdukeslaw.com

**Davis M. Bessho**
*Attorney for Transportation Ins. Co.*
Cozen O'Connor
The Promenade, Suite 400
1230 Peachtree Street N.E.
Atlanta, GA 30309
dbessho@cozen.com

/s C. Jeffery Ash
OF COUNSEL