

FILED

2021 Mar-22  PM 04:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| JOSHUA HOUSLEY and )<br>TRANSPORTATION INSURANCE )<br>COMPANY as subrogee of Dixie )<br>Pulp & Paper, )<br> )<br>        **Plaintiffs,** )<br> )<br>**v.** )<br> )<br>**LIFTONE, LLC.,** )<br> )<br>        **Defendant.** ) | **Civil Action No.**<br><br>**7:20-CV-00010-LSC** |

## PLAINTIFFS' OPPOSITION TO DEFENDANT LIFTONE, LLC'S MOTION TO EXCLUDE THE TESTIMONY AND REPORTS OF PLAINTIFFS' EXPERTS HEATH SMITH AND PERRY A. HOPKINS

Plaintiffs oppose Defendant LiftOne, LLC's motion to exclude the testimony and reports of experts Heath Smith and Perry A. Hopkins. As discussed below, both experts are highly qualified and reliable, and their testimony would be helpful to the jury. *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Defendant fails to acknowledge the extent to which Mr. Smith and Mr. Hopkins are qualified and seeks to impose an even higher standard on the admissibility of expert testimony under *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993). Both experts are highly credentialed and absolutely qualified to offer expert testimony in their respective fields. Their opinions are

reliable, relevant, and well within the purview of Rule 702. The Court should deny Defendant's motion in its entirety.

## I.  FACTS

This action arises from the August 6, 2018, fire at the Dixie Pulp and Paper, Inc., bulk paper handling facility in Tuscaloosa, Alabama. *See* Joint Status Report [Doc. 19], Undisputed Material Facts ("JSR") ¶¶ 1–2.  Plaintiffs Joshua Housley and Transportation Insurance Company, Dixie Pulp's insurer, filed suit on January 3, 2020, alleging that Defendant Liftone, LLC, caused the fire. *See generally* Compl. [Doc. 1].

The fire originated in a 2014 Hyster lift truck leased by Dixie Pulp from Defendant for use in its paper plant. JSR ¶ 5, 8, 17. At the time of the fire, Dixie Pulp had a "Full Maintenance Agreement" in effect with Defendant covering its fleet of lift trucks.  *Id.* at ¶ 6.  Pursuant to the Full Maintenance Agreement, defendant LiftOne was responsible for performing all periodic maintenance and service for Dixie Pulp's fleet of lift trucks, except for daily operator cleaning and preventive maintenance checks and services.  *Id.* at ¶ 7.  The lift truck that the fire originated in was covered by the "Full Maintenance Agreement."  *Id.* at ¶ 9.

The lift truck was manufactured by Hyster and supplied by defendant LiftOne with a "paper mill package." *Id.* at  ¶10.  The paper mill package is optional lift truck equipment designed for lift trucks used in paper manufacturing

LEGAL\51477063\1

and handling facilities.  *Id.* at ¶ 11.  The paper mill package consists of thermal heat shields on the lift trucks engine exhaust system to protect against the fire hazard created by paper dust and debris contacting a hot exhaust system. *Id.* at ¶ 12.  The paper mill package includes heat shields specifically for the engine exhaust manifolds.  *Id.* at ¶ 13.   A post fire inspection of the lift truck showed that the paper mill package heat shields for the engine exhaust manifolds were missing. *Id.* at ¶ 20.

Plaintiff's investigation indicated that the fire was caused by combustible materials coming into contact with the lift truck's exhaust manifold. Compl. ¶ 14. Plaintiffs allege this was possible because the heat shields had been removed during a previous repair performed by LiftOne and never reinstalled. *Id.* ¶ 15.

In August of 2018, Plaintiffs retained John Neil of Unified Investigations and Sciences ("UIS") as an expert to opine on the cause and origins of the fire. *See* Smith Rpt. at 3.[1] Mr. Neil performed an initial fire scene examination, and participated in a multi-party examination and a laboratory examination of the lift truck and associated fire evidence. *Id.* Mr. Neil left his position at UIS in August of 2020. His caseload, including this matter, was transferred to Heath Smith of EFI Global.[2] *Id.*

---

[1] Mr. Smith's Report is attached as Exhibit 1.
[2] UIS is now known as EFI Global.

Mr. Smith reviewed Mr. Neil's file, conducted his own independent investigation, and formed some hypotheses regarding the fire's origin and cause. *See generally id.* He concluded that the fire originated from the right side of the forklift engine and ultimately identified two potential sources of ignition: (1) electrical arcing at the cable proving power from the battery to the starter, or (2) ignition of paper particles by the exhaust manifold caused by the missing heat shields. *Id.* at 6.

Mr. Smith consulted electrical engineer Perry A. Hopkins to offer his opinions as to whether the electrical arcing started the fire, or whether the fire caused the electrical arcing. Mr. Hopkins also examined the lift truck and an exemplar in August of 2020, and conducted further research and analysis. *See* Hopkins Rpt. at 2-3.[3] Based upon his inspection and observations, Mr. Hopkins determined that the electrical arcing was caused by the fire, and not the other way around. *Id.* He provided an expert report to that effect in October of 2020. *See generally id.*

Both Plaintiffs' and Defendant's expert agree that the fire originated in the same part of the forklift engine.[4] The primary dispute in this case is whether the fire was caused by electrical arcing or whether the fire resulted from paper debris accumulating where the heat shield should be. Mr. Hopkins' opinion is important

---

[3] Mr. Hopkins Report is attached as Exhibit 2.
[4] The report of James McCann, defendant's expert, is attached as Exhibit 3.

to understand why the electrical arcing found on the starter cable was the result and not the cause of the fire.  Likewise, Mr. Smith's analysis of the fire's origin and cause is also important to understand this case.

## II. ARGUMENT

### A. Admissibility of Expert Opinions and Testimony

The admissibility of expert opinions and testimony are governed by Fed. R. Evid. 702. Rule 702 is as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

For expert testimony to be considered reliable, "the reasoning or methodology underlying the testimony [must be] scientifically valid" and must be "properly . . . applied to the facts in issue." *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993). Factors considered include (1) whether the expert's theory can and has been tested, (2) whether the theory has been subject to peer review and publication, (3) whether the known or potential

rate of error of the methodology is acceptable, and (4) whether the theory is generally accepted in the scientific community. *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94).

The inquiry is fact-specific and the trial court has "considerable leeway" in determining whether expert testimony is reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). Even so, "the rejection of expert testimony is the exception rather than the rule." *See* Fed. R. Evid. 702 advisory committee's note. The focus is "solely on principles and methodology"—not the expert's conclusions themselves. *Daubert*, 509 U.S. at 595.

"[N]either *Daubert* nor Federal Rule of Evidence 702 requires a trial judge to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014). But "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996). So long as an expert's opinion rests on reliable grounds based on what is known to the scientific community, the testimony is reliable for purposes of Rule 702—any doubts as to the efficacy of such an opinion goes to weight, not admissibility, and the opinion is properly subjected to the adversarial process. *Daubert*, 509 U.S. at 590; *Frazier*, 387 F.3d at 1261. More plainly, the "exclusion of an expert's opinion is proper

6

only if it is so fundamentally unsupported that it can offer no assistance to the jury." *Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997) (citation omitted).

In the Eleventh Circuit, the admissibility of expert testimony under Rule 702 is determined by three factors:   (1) whether the expert is qualified to offer competent testimony on the matters he or she intends to address; (2) whether the expert's methodology in reaching his or her conclusions is sufficiently reliable under *Daubert*; and (3) whether the testimony assists the trier of fact in understanding the evidence or determining a fact in issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). In short, the expert must be qualified, the testimony must be reliable, and the testimony must be helpful to the fact finder. *Id.*

## B.    Both of Plaintiff's Experts Are Highly Qualified.

For an expert to testify in the form of an opinion, he or she must possess sufficient knowledge, skill, experience, training, or education on the subject matter at issue.  *See* Fed. R. Evid. 702.  However, "Rule 702 does not mandate that an expert be highly qualified to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).   In addition, a given expert is not strictly confined to his area of practice, but may testify concerning related applications, and any perceived lack of specialization should

7

generally go to the weight of the evidence rather than its admissibility. *United States v. Wen Chyu Liu*, 716 F.3d 159, 168-69 (5th Cir. 2013). This liberal approach to an expert's qualifications may have been best explained in the case of *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), in which the Sixth Circuit stated:

> if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee . . . . On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness *if* a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*Berry,* 25 F.3d at 1349-50.

As noted above, and further documented on their respective *curriculum vitae,*[5] both Mr. Smith and Mr. Hopkins have ample knowledge, training, education, and experience to offer expert opinions on issues in this matter.

### 1. Heath Smith's Professional Fire Experience Makes Him Abundantly Qualified as an Expert.

Mr. Smith has 13 years of experience in fire investigations, including specific experience with motor vehicle fires. *See* Smith CV. He currently holds the following certifications: Certified Fire Investigator, International Association of

---

[5] The CVs of Mr. Smith and Mr. Hopkins are both attached as Exhibits 4 and 5, respectively.

Arson Investigators; Certified Motor Vehicle Fire Investigator, International Association of Arson Investigators; Private Detective, State of Georgia; Private Investigator, State of Tennessee; Fire Inspector II, International Code Council; Fire Investigator, Alabama Fire College; and Firefighter II, Alabama Fire College. *Id.* He has worked as a firefighter, a fire chief, a fire investigator, and an assistant fire marshal. *Id.* He has well over 500 hours of tested training related to fires. Mr. Smith's training includes "Basic Electricity," "Arc Mapping Basics," "Evidence Examination," "Electrical Safety," "Explosion Dynamics," "Managing Complex Fire Scene Investigations," "Thermometry, Heat, and Heat Transfer," "Understanding Undetermined," "Motor Vehicles: The Engine and Ignition, Electrical, and Fuel Systems," and "Investigating Motor Vehicle Fires," all of which have elements relevant to this case. *Id.* at 2–4.

It is difficult to discern from Defendant's brief exactly what it claims is deficient in Mr. Smith's qualifications. Defendant seems to suggest that Mr. Smith has not been a fire investigator for long enough, arguing that "[h]is first involvement with fire investigation was while working in Gadsden from 2017-2018." Def.'s Brf. at 25. However, neither *Daubert* nor Rule 702 require any specific number of years of experience for a witness to be considered an expert. Moreover, Defendant is simply wrong to claim that Mr. Smith's first experience

with fire investigations was in "2017-2018."  Mr. Smith testified[6] as follows in his

deposition:

> Q. What'd you do with Gadsden Fire Department?
>
> A. I started out as a firefighter and progressed through the ranks and ultimately became the assistant fire marshal.
>
> Q. And with Gadsden -- how long were you employed at Gadsden?
>
> A. From 2007 to 2018.
>
> Q. What did you do in 2018? Is that when you came to work with EFI?
>
> A. That's when I took the chief's position in Argo, Alabama.

Smith Dep. 36:22-37:10.

> Q. So, your first involvement with fire investigations was while you were working with the City of Gadsden?
>
> A. Actually, that's where the majority of the experience came from, yes.  But on every fire, as a firefighter, it's kind of our duty to general origin and cause so that we can determine whether or not to escalate the investigation to the next level.  So, every fireman has some level of fire investigation training.
>
> Q. Go ahead. I'm sorry.
>
> A. Albeit minimal early on, it's --there is some degree of training initially.

*Id.* at 38:22-39:12.

---

[6] Cited extracts from Mr. Smith's deposition are attached as Exhibit 6.

It is not clear where Defendant got the notion that Mr. Smith has been involved in fire investigations only since "2017-2018." As his CV indicates and as he testified in his deposition, the majority of his fire investigation experience began in 2007, but his initial fire investigation experience began many years earlier when he first became a firefighter.   Mr. Smith's fire investigation experience and qualifications are extensive.

Defendant also appears to suggest that Mr. Smith is not qualified because this case involves an electrical issue and he is not an electrical engineer.  However, Rule 702 does not require any specific credentials so long as the witness has the relevant knowledge and experience to offer expert opinions. Defendant seeks to arbitrarily raise the bar for what constitutes an "expert" well above and beyond what is required under the law. As stated in *Frazier*:

> [W]e observe that experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, *experience in a field may offer another path to expert status*. In fact, the plain language of Rule 702 makes this clear: expert status may be based on 'knowledge, skill, experience, training, *or* education.

387 F.3d at 1244, 1261–62 (emphasis added).  As discussed above, Mr. Smith's CV shows that he has extensive training on electrical issues as they pertain to fire investigations, in addition to having a certification in motor vehicle fires.  Clearly, Mr. Smith is qualified to offer his informed, expert opinions on the cause and origin of a fire, including a motor vehicle fire in which electrical issues are a

11

factor.  As previously noted, an expert is not limited to a narrow specialty, may testify in related areas, and any doubts regarding the expert's perceived lack of specialization goes to weight, not admissibility. *United States v. Wen Chyu Liu,* 716 F.3d 159, 168–69 (5th Cir. 2013).

## 2. Perry A. Hopkins is also highly qualified as an expert, as evidenced by his training, experience, and education.

Likewise, Defendant questions the qualifications of Mr. Hopkins who was consulted to test the hypothesis that electrical arcing caused this fire. Defendant's argument demonstrates a fundamental misunderstanding of how specialized an expert need be to offer an opinion. Just like Mr. Smith can offer expert opinions to a certain extent on electrical fires, even though he isn't a trained electrician or electrical engineer, Mr. Hopkins can also offer expert insights on electrical fires, even though he isn't a fire investigator.

Mr. Hopkins is also highly qualified. He is an electrical engineer who has been involved in the fire investigation for over 18 years. *See* Hopkins CV at 1. In addition, Mr. Hopkins has over 10 years of experience in compliance testing for industrial equipment and motor-operated appliances. *Id.* He has worked as an engineering consultant, a forensics electrical engineer, and a compliance engineer. *Id.* at 2. He has considerable training hours devoted to fire and electrical forensics. His training includes nearly 600 hours of fire-related continuing education. *Id.* at 4. He has presented on "Electrical Fire Causations and Analyses," "Product

12

Liability—Investigators, Analyses, Tools and Case Study," "Arc Mapping Tools and Techniques," "Electrical Aspects of Fire Investigators," "Thermal Devices and Thermal Cut-outs," "Basic Electrical Investigations," "Look, Listen and Learn, Tips in Performing an Efficient Investigation from the Aspect of an Electrical Engineer," "Product Safety: What Makes a product safe?" and "Motor Operated Appliances Training," all of which have relevance to this matter. *Id.* at 4–5. He has been previously certified as an expert in twelve different federal court cases. Mr. Hopkins is certainly qualified to opine on whether electrical arcing started a fire. Defendant offers no viable argument that either expert is unqualified to render expert opinions in this case.

## C. Both Mr. Smith and Mr. Hopkins Offer Reliable Opinions

Though the Court has a responsibility to act as a "gatekeeper," the question of reliability is an inquiry into only the "principles and methodology [applied by the expert], not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95. Trial courts may not "determine which of several competing scientific theories has the best provenance." *Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) (quoting *Ruiz-Troche v. Pepsi-Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)). A party offering expert testimony does not need to convince a judge that the expert's conclusions are correct—just that the

expert arrived at his or her conclusions "in a scientifically sound and methodically reliable fashion." *Id.*

National Fire Protection Association Publication 921, "Guide for Fire and Explosion Investigations," ("NFPA 921") "is the industry standard for fire investigation." *United Fire and Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013). An expert need not explicitly reference NFPA 921, so long as the expert's methodologies largely parallel NFPA 921, the methodology is considered sound. *McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 651 (D. Kan. 2003). The basic methodology mandated by NFPA 921 is the "scientific method." NFPA 921, Chpt. 4.[7] As Mr. Smith put it in his deposition:

> So, we use what's referred to as the scientific method in which you need to recognize the need. So, obviously, there was a fire. You define the problem, what the fire was. You collect data. And then, you analyze that data. And you develop hypotheses, and then, you test said hypotheses. And then, you select a final hypothesis from your testing.

Smith Dep. at 154:15-155:6.

The scientific method has been universally recognized as a reliable methodology for purposes of a *Daubert* inquiry. *See, e.g., Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)("the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable"); *Castellow v. Chevron USA*, 97 F. Supp.2d 780, 783 (S.D. Tex. 2000)("the burden

---

[7] Cited extracts from NFPA 921 are attached as Exhibit 7.

to demonstrate that the expert's findings and conclusions are based on valid scientific method, and are therefore reliable, is placed on the party seeking its admission."). Both Mr. Smith and Mr. Hopkins used the approved scientific method in their investigations.

### 1. Mr. Smith

Because Mr. Smith's opinions and testimony are based on sufficient facts and data, are the product of a reliable methodology, and arise from a reliable application of that methodology to the facts in this case, his testimony is admissible under Rule 702. Defendant argues that "in actuality there was nothing 'scientific' and very little 'method' employed" in Mr. Heath's analysis. Def.'s Brf. at 10. In reality, the very passage from Mr. Heath's deposition that Defendant quotes, as well as his report, proves that Mr. Heath employed the scientific method.

He examined the data collected by Mr. Neil during site examinations and a laboratory inspection. He personally examined the remains of the lift truck in a laboratory setting. He collected weather data from the day of the fire. He examined interview transcripts and written statements obtained by Mr. Neil and the Tuscaloosa Fire Investigator. He examined the report put out by Tuscaloosa Fire Fire Department.[8]

---

[8] Despite Defendant's suggestion to the contrary, Mr. Smith was under no obligation to blindly rely on the opinion of the Tuscaloosa Fire Department that the fire's cause was "undetermined."

Then, Mr. Smith analyzed the data. He identified fire-spread patterns within the lift truck, and determined where the fire originated. And, based on his knowledge, training, and experience, Mr. Smith developed multiple hypotheses— the fire might have been started due to engine intake backfire, electrical arcing, or ignition of paper particles resulting from direct contact with the unprotected engine manifold. Mr. Smith quickly eliminated the first hypothesis, because the lift truck was not operating when the fire started.

He relied on Mr. Hopkins' engineering expertise to test the arcing hypothesis, which was likewise eliminated. Ultimately, Mr. Smith was unable to eliminate ignition of paper particles by the engine exhaust manifold. In short, Mr. Smith followed the scientific method as outlined in NFPA 921 to the letter.

Defendant provides no real basis for arguing that Mr. Smith failed to adhere to the scientific method, other than to claim that he "made no effort to do any testing to replicate his theory that the ignition of dust and debris caused the fire." Def.'s Brf. at 19.   However, this argument is based on a fundamental misunderstanding of NFPA 921 and the scientific method itself.

Defendant's criticism of Mr. Smith for not conducting physical testing is completely unfounded. Physical, experimental testing is not a requirement under NFPA 921. It is merely one option out of several alternatives.   Rather, "[a] hypothesis can be tested physically by conducting experiments, analytically by

applying accepted scientific principles, or by referring to scientific research." *See* NFPA 921 § 4.3.6.   Cognitive testing is a perfectly valid means of testing a hypothesis. "In a cognitive experiment, one sets up a premise and tests it against the data." *Id.* § 19.6.4.4. "An example of a cognitive experiment is, 'If it were posited that the door was open during the fire and the hinges were found with mirror images patterns, then the hypothesis would be disproved.'" *Id.*

Defendant's argument that Mr. Smith needed to perform physical testing "to replicate his theory that the ignition of dust and debris caused the fire" is particularly specious in this case where it is undisputed that the lift truck's exhaust system is capable of igniting paper dust and debris.  *See* JSR at ¶ 12.  Indeed, that is the very reason the lift truck at issue was supplied by Defendant with the "paper mill package" that included the heat shields on the exhaust manifolds found to be missing after the fire. *Id*. at ¶¶ 10-13, 20.  Plaintiff's expert need not conduct physically testing to confirm what has been agreed to by Defendant.  Moreover, defendant's own expert agreed this is a viable ignition theory.  McCann Rpt. at 5.

For this reason, Defendant's reliance on *United Fire & Casualty Co. v. Whirlpool Corp.,* 704 F.3d 1338 (11th Cir. 2013) is misplaced.  In that case, the court affirmed the exclusion of a novel fire ignition theory by plaintiff's expert because he had not tested any exemplars to confirm its plausibility, could not point to any literature supporting his theory, and he admitted he had never seen such an

ignition sequence before in his professional experience. *Id.* at 1340. In this case, however, Defendant has stipulated that ignition of paper dust and debris by hot exhaust components is a viable ignition sequence. Moreover, ignition of combustibles by a hot engine manifold is not a novel ignition theory. It is explicitly recognized by NFPA 921, § 27.4 (ignition sources in motor vehicle fires include "hot surfaces of the engine exhaust system" including "the exhaust manifold"). Finally, and most obviously, this is the reason why the lift truck was equipped with exhaust manifold heat shields in the first place.

### 2. Mr. Hopkins

Mr. Hopkins was called in to assist Mr. Smith in testing one hypothesis—and one that fits *squarely* within his practice area. He was called in to inspect the lift truck's electrical system and determine whether the fire could have been started by electrical arcing of the cable providing power from the battery to the starter near the rear portion of the engine. And he determined that it was not, based on his inspection of an exemplar lift truck, the service history of the lift trucks, recall documentation, and the fact that the battery cable had worked perfectly for years without any issues.

Defendant makes much of the fact that Hopkins was slow to make his conclusion until after he had performed all of the above-referenced evidence and documentation. But this argument, frankly, is nonsense. The fact that an expert is

18

*methodical* and slow to reach their conclusions is exactly the way that an expert is

supposed to investigate. Likewise, Defendant seeks to undermine Mr. Hopkins'

conclusions by pointing out that he cannot "absolutely rule out the possibility of a

defect in the cable" as a cause of the fire. Under NFPA 921, Mr. Hopkins is not

required to "absolutely rule out" every possibility before coming to a conclusion:

> **4.5 Level of Certainty.**   The level of certainty describes how
> strongly someone holds an opinion (conclusion). Someone
> may hold any opinion to a higher or lower level of certainty.
> That level is determined by assessing the investigator's confi-
> dence in the data, in the analysis of that data, and testing of
> hypotheses formed. That level of certainty may determine the
> practical application of the opinion, especially in legal proceed-
> ings.
>
> **4.5.1**   The investigator should know the level of certainty that
> is required for providing expert opinions. Two levels of
> certainty commonly used are probable and possible:
>
> (1)   Probable. This level of certainty corresponds to being
>        more likely true than not. At this level of certainty, the
>        likelihood of the hypothesis being true is greater than
>        50 percent.
> (2)   Possible. At this level of certainty, the hypothesis can be
>        demonstrated to be feasible but cannot be declared prob-
>        able. If two or more hypotheses are equally likely, then
>        the level of certainty must be "possible."
>
> **4.5.2**   If the level of certainty of an opinion is merely "suspec-
> ted," the opinion does not qualify as an expert opinion. If the
> level of certainty is only "possible," the opinion should be
> specifically expressed as "possible." Only when the level of
> certainty is considered "probable" should an opinion be
> expressed with reasonable certainty.

The fact that Mr. Hopkins candidly concedes that he cannot "absolutely rule

out" the possibility that the electrical arc was the cause of the fire in no way

detracts from the admissibility of his opinion that it probably was not.

As with Mr. Heath, defendant also criticizes Mr. Hopkins for not conducting

"microscopic or other scientific examination of the subject battery cable to

determine if its properties are consistent with having arced and caused the fire or

having arced as a result of it."  Def.'s Brf. at 27.  As discussed above, such physical testing is not necessarily required under N.F.P.A. §921 or the scientific method.  Moreover, with regard to the particular issue Mr. Hopkins was addressing, whether the electrical arcing was the cause or effect of the fire, it is not even possible.  As noted in Mr. Hopkins declaration[9], there is no such test that will reliably distinguish between an electrical arc that was the cause of the fire and one that was the result of a fire.  Hopkins Decl. at ¶ 4.

Because there is no direct evidence that will distinguish a "victim" arc from a "cause" arc, Mr. Hopkins reached his conclusion using deductive reasoning, the procedure approved of by NFPA 921 and the scientific method. *See* NFPA 921, § 4.3.6.  Mr. Hopkins collected data by examining the truck involved in the fire and an exemplar model (which indicated no problems with the way the cable was installed, routed, and protected).  He searched for recall and technical service bulletins on the lift truck, which might indicate a manufacturing or design issue, and reviewed service and repair documentation for any indications of a problem, all with negative results.  Hopkins Decl.  at ¶ 6-9.  Finding no service history or recalls, Mr. Hopkins reasoned that the fire was not caused by a defect in the cable, or wear induced deterioration of the cable because it had been in use for a long

---

[9] See *McHugh v. Olympia Enter't, Inc.,* 37 Fed. Appx. 730, 735 (6th Cir. 2002) ("nothing in Rule 26 … precludes an expert from revising or further clarifying opinions, particularly in response to points raised in the presentation of a case.").

period of time without incident; and there had been no recalls or technical bulletins issued on the battery cables. This is a textbook example of deductive reasoning as reflected in NPFA 921, § 4.3.6. The fact that Defendant's expert disagrees with his conclusion goes to weight, not admissibility.[10]

Defendant has failed to point to any meaningful fact or data point which either expert overlooked in their analysis.  As discussed above, it is clear that Mr. Hopkins employed the reliable methodology adopted by NFPA 921 in reaching his conclusions.

### 3. Both the Testimony of Mr. Hopkins and Mr. Smith Are Relevant and Helpful to the Jury

Both Mr. Smith and Mr. Hopkins are clearly qualified and they employed sound methodologies.  The third test for the admissibility of expert testimony in the Eleventh Circuit is whether the proffered testimony assists the trier of fact in understanding the evidence or determining a fact in issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  Defendant makes no real effort to challenge them on this point.

---

[10] Defendant also states that the evidence of the battery cable's pristine operating history is inadmissible because "the condition of the place or thing at such times was [not] substantially the same as the condition existed at the time of the accident in the subject suit." But this argument falls apart almost immediately—surely the conditions inside of the lift truck were "substantially similar" in the days prior to the accident when this battery cable was in use. There is no required "showing" of substantial similarity, especially where the conditions being compared *involve the same lift truck.*

Clearly, the expert testimony of a fire investigator will be helpful in understanding the origin and cause of the fire.  Likewise, the testimony of an electrical engineer will be helpful in understanding the electrical issue in this case. In fact, their opinions go to the very heart of the matter and are essential to a fair adjudication of case. To the extent that Defendant challenges the relevance or helpfulness of either expert, it must be denied.

## CONCLUSION

Defendant's challenge to Perry A. Hopkins and Heath Smith in this matter is precisely the type of challenge that should be rejected. Instead of proffering a well-reasoned critique, Defendant engages in a "throw everything at the wall and see what sticks" strategy. And, in this case, nothing does.

As easily demonstrated here, both experts are highly qualified to offer the opinions proffered in this case. Both opinions apply NFPA-accepted methodologies and are based on sufficient facts and data, and therefore are reliable. Finally, the opinions are relevant and will be helpful to the trier of fact because the issues in this case are outside of common knowledge and everyday experience. In summary, both Mr. Smith's and Mr. Hopkins' opinions are essential to a full and fair resolution of this case. Defendant has presented no valid argument justifying the exclusion of either expert.

Respectfully submitted this 22nd day of March, 2021.

s/David M. Bessho

David M. Bessho (pro hac vice)
Cozen O'Connor
1230 Peachtree Street, NE, Suite 400
Atlanta, Georgia 30390
(404) 572-2046 (phone)
(877) 526-3074 (fax)
dbessho@cozen.com
*Attorney for Transportation Ins. Co.*

s/Justin L. Smith

Justin L. Smith
(ASB-4461-U82S)
Cross & Smith, LLC,
907 17th Avenue
Tuscaloosa, AL 35401
*Attorney for Joshua Housley*

John W. Scott (ASB-1788-T68J)
Scott, Dukes & Geisler, P.C.
211 Twenty-Second Street North
Birmingham, Alabama  35203
(205) 244-2501 (phone)
(205) 251-6773 (fax)
*Local Counsel- Transportation Ins.
Co.*

23

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JOSHUA HOUSLEY and** | ) | |
| **TRANSPORTATION INSURANCE** | ) | |
| **COMPANY as subrogee of Dixie** | ) | |
| **Pulp & Paper,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.** |
| | ) | |
| **v.** | ) | **7:20-CV-00010-LSC** |
| | ) | |
| **LIFTONE, LLC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this, the 22nd day of March, 2021, I electronically

filed the foregoing using CM/ECF, which will send notification of such filing to:

C. Jeffrey Ash
Porterfield, Harper, Mills, Motlow & Ireland, P.A.
22 Iverness Center Parkway, Suite 600
Birmingham, AL  35242
cja@phm-law.com
*Attorney for Defendant*

/s/David M. Bessho
David M. Bessho (pro hac vice)

LEGAL\51477063\1